UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

NA YEON KIM,

Petitioner,

- against -

MICHAEL SKINNER,

Respondent.

**RESPONDENT'S TRIAL BRIEF**

Case No. **6:25-CV-1585 (MJK)**

Respondent Michael Skinner, by and through his attorney, respectfully submits this Trial Brief in opposition to Petitioner Na Yeon Kim's Petition seeking the return of the parties' minor child, C.P.S., to the Republic of Korea pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention") and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001–9011.

## PRELIMINARY STATEMENT

This case does not involve the secret or unilateral removal of a child from the Republic of Korea. C.P.S. traveled to New York with Respondent with Petitioner's knowledge and consent. Respondent purchased round-trip airfare and initially contemplated returning C.P.S. to Korea.

The dispute arose only after C.P.S. expressed that he did not want to return.

That distinction is important. This is not a case in which Respondent wrongfully removed C.P.S. from Korea at the inception of the child's travel. Rather, the Court must determine whether and when an initially authorized stay became a wrongful retention within the meaning of Article 3 of the Convention.

The evidence will further establish that C.P.S.'s objection to returning to Korea did not arise on the eve of this federal proceeding. His objection was expressed repeatedly, was documented during the New York Family Court proceedings, was communicated to persons other than Respondent, and has been maintained over time.

Respondent therefore respectfully requests that the Court interview C.P.S. in camera so that the Court may independently determine whether he genuinely objects to returning to Korea and whether he has attained an age and degree of maturity at which it is appropriate to take account of his views under Article 13 of the Convention.

Petitioner's consent and subsequent conduct present a separate Article 13(a) issue. Petitioner consented to C.P.S.'s initial travel to New York. The Court must therefore examine the nature and scope of that consent, the parties' communications after C.P.S. expressed that he did not wish to return, Petitioner's knowledge of the child's continued presence in New York and stated wishes, Petitioner's response to those circumstances, and whether her subsequent conduct constituted consent to continued retention or acquiescence.

The parties' divorce history also requires factual clarification. Respondent commenced a divorce action in New York in 2018. Petitioner was personally served in Korea but did not appear, and the Herkimer County Supreme Court entered a Judgment of Divorce on November 16, 2020. More than one year later, Petitioner commenced a separate divorce proceeding in Korea.

Respondent's position is that he did not receive notice of the Korean proceeding, did not participate in it, did not know Petitioner had obtained a separate Korean divorce judgment, and understood that the parties were operating under the existing New York Judgment of Divorce. Respondent is presently challenging the Korean judgment through the Korean appellate process.

Respondent does not ask this Court to decide the merits of the Korean appeal or to invalidate the Korean judgment. The procedural history is relevant because Petitioner has placed Respondent's knowledge of and participation in the Korean proceedings at issue. The factual question whether Respondent knowingly disregarded a Korean judgment must be distinguished from the separate legal question of what custody rights existed under applicable law for purposes of Article 3.

Ultimately, this proceeding is not a plenary custody trial. The Convention provides a provisional remedy designed to determine the appropriate forum for custody litigation, not to decide ultimate custody. *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020).

For the reasons that follow, Respondent respectfully submits that the Petition should be denied.

## STATEMENT OF FACTS

### A. The Parties and Respondent's Relationship With C.P.S.

Respondent Michael Skinner and Petitioner Na Yeon Kim are the parents of C.P.S., who was born in November 2014. The parties were married in the Republic of Korea in 2013. After the marriage deteriorated, Respondent returned to New York while Petitioner remained in Korea with C.P.S.

Respondent nevertheless maintained a continuing relationship with his son. Petitioner acknowledged that Respondent traveled to Korea approximately two or three times each year and remained for extended visits. During those visits, Respondent exercised parenting time with C.P.S.

Respondent testified that his visits frequently lasted several weeks or as long as one month, that C.P.S. stayed with him overnight, and that Respondent continued to provide financial support and maintain an active parental relationship. These facts are relevant to the parties' course of dealing, their respective custody-related conduct, and the history preceding the January 2025 trip.

### B. The New York Judgment of Divorce and Subsequent Korean Proceeding

On October 18, 2018, Respondent commenced an action for divorce in Supreme Court, Herkimer County. The Petitioner was personally served in Korea but did not appear or answer. On November 16, 2020, Supreme Court entered a Judgment of Divorce.

The New York Judgment did not adjudicate custody or visitation.

More than one year later, Petitioner commenced a separate divorce action in Korea.

Respondent maintains that he was not given notice of that proceeding, that he did not participate in it, that he did not know a Korean divorce judgment had been entered, and that he continued to understand the parties' marital status and relationship through the existing New York Judgment of Divorce. He is now challenging the Korean judgment through the Korean appellate process.

Respondent does not offer the Korean appellate evidence to obtain an adjudication of that appeal from this Court. It is offered to explain Respondent's knowledge and conduct and to rebut

any contention that he knowingly ignored or refused to participate in a Korean proceeding of which he was aware.

**C. C.P.S.'s Travel to New York Was Consensual**

Petitioner voluntarily consented to C.P.S.'s travel to New York.

Respondent does not dispute that the parties initially contemplated that C.P.S. would return to Korea. Respondent purchased round-trip airfare and initially intended to accompany the child on the return trip.

Accordingly, the January 2025 departure from Korea was not itself wrongful. The pertinent Convention issue is whether and when the initially authorized stay became a wrongful retention.

**D. C.P.S. Objected to Returning to Korea**

After arriving in New York, C.P.S. repeatedly expressed that he did not wish to return to Korea. The child threatened to run away if he was forced to return.

Respondent thereafter sought relief through New York Family Court and disclosed that C.P.S. was residing with him and did not want to return.

C.P.S.'s objection has continued over time and has been expressed to persons other than Respondent, including the Attorney for the Child assigned to represent C.P.S. in the Family Court proceeding. The Respondent intends to present firsthand testimony from individuals who have interacted substantially with C.P.S., including his pastoral counselor, his stepmother, and an athletic coach. Those witnesses will testify concerning matters personally observed, including demeanor, communication, maturity, consistency, behavior, independence, and the circumstances in which C.P.S. expressed his views.

Respondent does not offer those witnesses to render psychiatric opinions or custody recommendations. Their testimony supplies factual context for the Court's own assessment of C.P.S.

Respondent respectfully requests that the Court interview C.P.S. in camera.

## LEGAL STANDARD

The Hague Convention seeks to secure the prompt return of children wrongfully removed to or retained in a Contracting State and to ensure respect for custody and access rights. *Abbott v. Abbott*, 560 U.S. 1, 8–9 (2010).

Under ICARA, Petitioner bears the burden of establishing by a preponderance of the evidence that C.P.S. was wrongfully removed or retained within the meaning of the Convention. 22 U.S.C. § 9003(e)(1)(A).

Article 3 provides that a removal or retention is wrongful where it breaches rights of custody attributed under the law of the State in which the child was habitually resident immediately before the removal or retention and those rights were actually exercised, or would have been exercised but for the removal or retention.

Habitual residence is determined from the totality of the circumstances specific to the case through a fact-driven inquiry sensitive to the child's unique circumstances. *Monasky v. Taglieri*, 589 U.S. 68, 77–78 (2020).

Even if Petitioner establishes wrongful retention, the Convention expressly recognizes exceptions to return.

Article 13(a) provides that the Court is not bound to order return where the person opposing return establishes that the petitioner "had consented to or subsequently acquiesced in the removal or retention." Hague Convention art. 13(a). Respondent bears the burden of establishing the defense by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B).

Article 13 further provides that the Court "may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention art. 13. Respondent likewise bears the burden of establishing that exception by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B).

## POINT I
## BECAUSE C.P.S. CAME TO THE UNITED STATES WITH PETITIONER'S CONSENT, THE COURT MUST DETERMINE WHETHER AND WHEN HIS SUBSEQUENT RETENTION BECAME WRONGFUL

Petitioner bears the burden of establishing wrongful retention under Article 3 and 22 U.S.C. § 9003(e)(1)(A).

C.P.S. did not leave Korea without Petitioner's knowledge or consent. Petitioner authorized the trip, and Respondent purchased round-trip airfare.

Because Petitioner consented to C.P.S.'s departure from Korea, the January 2025 departure was not a wrongful removal within the meaning of Article 3. The relevant question is whether and when the initially authorized stay subsequently became a wrongful retention.

The issue is when, if at all, the authorized stay transformed into a wrongful retention.

The Second Circuit has expressly recognized that a parent may authorize or extend a child's stay outside the State of habitual residence and that the scope and duration of that authorization affect the date on which retention becomes wrongful. *Swett Urquieta v. Bowe*, 120 F.4th 335, 338–40 (2d Cir. 2024).

Accordingly, the Court should determine the operative retention date by examining the actual agreement between the parties, the original return arrangements, any subsequent authorization or extension, the communications after C.P.S. expressed that he did not wish to return, and Petitioner's responses.

The mere fact that a return flight existed does not relieve the Court of determining what the parties thereafter said and did.

## POINT II
## PETITIONER'S CONSENT AND SUBSEQUENT CONDUCT MUST BE CONSIDERED UNDER ARTICLE 13(a)

Article 13(a) provides that the Court need not order return where Petitioner consented to or subsequently acquiesced in the removal or retention. Hague Convention art. 13(a); 22 U.S.C. § 9003(e)(2)(B).

In assessing consent, the Court must examine the **nature and scope of the authorization actually given**, including conditions or limitations placed upon the child's stay.

*Mota v. Castillo*, 692 F.3d 108, 117–18 (2d Cir. 2012), is instructive. There, the Second Circuit analyzed the Article 13(a) consent defense and held that consent may be conditional; when the condition upon which consent was given failed, the consent did not authorize the continued retention.

Similarly, *Hofmann v. Sender*, 716 F.3d 282, 294–95 (2d Cir. 2013), recognizes that consent to an initial removal does not necessarily constitute consent to continued retention beyond the conditions or circumstances contemplated by the consenting parent. Later Second Circuit authority continues to cite *Hofmann* for this distinction.

Those principles require a fact-specific examination here.

Petitioner undeniably consented to C.P.S.'s initial presence in New York. The Court must therefore determine: the intended duration and scope of that consent; what Petitioner knew when C.P.S. objected to returning; what C.P.S. communicated directly to Petitioner; how Petitioner responded; whether Petitioner expressly or impliedly permitted any continuation of the stay; when she first unequivocally demanded return; and what conduct followed thereafter.

Respondent does not contend that mere silence or passage of time automatically establishes acquiescence. Rather, the Court must consider the entirety of Petitioner's contemporaneous words and conduct.

Those communications are far more probative of the parties' intent than retrospective characterizations developed after litigation began.

If Respondent establishes by a preponderance of the evidence that Petitioner consented to the continued retention or subsequently acquiesced in it, Article 13(a) permits the Court to decline return.

## POINT III
## THE COURT SHOULD DETERMINE DIRECTLY WHETHER C.P.S. OBJECTS TO RETURNING TO KOREA AND HAS ATTAINED SUFFICIENT AGE AND MATURITY FOR HIS VIEWS TO BE CONSIDERED

Article 13 provides that a court may refuse return where "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention art. 13.

There is no categorical minimum age under the Convention. In *Blondin v. Dubois*, the Second Circuit declined to hold that an eight-year-old was too young as a matter of law for her views to be considered. (*Blondin v. Dubois*, 238 F.3d 153, 166–67 (2d Cir. 2001).

Whether a particular child possesses sufficient maturity is a factual determination based upon the individual circumstances of the case. *Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 205 (E.D.N.Y. 2010).

As *Haimdas* explains, there are no established objective criteria or mechanical tests for assessing maturity under Article 13. The evidence here warrants a direct assessment of C.P.S.

The child's objection did not arise on the eve of trial. The record reflects that he expressed that he did not want to return shortly after arriving in New York and continued expressing his position thereafter.

The Court should consider that history together with its own assessment of C.P.S.'s demeanor, reasoning, ability to understand the circumstances, independence, ability to articulate his views, and the particular reasons for his objection.

The approach taken in *Swett v. Bowe* is particularly instructive. There, the district court conducted an extensive in-camera interview of an eleven-year-old child, considered the child's testimony and demeanor, and also considered observations from teachers, a counselor, parents, relatives, and other persons who knew the child. The court emphasized the consistency, coherence, and durability of the child's views. *Swett v. Bowe*, 733 F. Supp. 3d 225, 263–71 (S.D.N.Y. 2024).

That framework is particularly appropriate here.

Respondent respectfully requests that the Court interview C.P.S. in camera and determine for itself whether the Article 13 standard is satisfied.

## POINT IV
## ARTICLE 13 REQUIRES AN OBJECTION TO RETURN, NOT MERELY A PREFERENCE TO LIVE WITH ONE PARENT

Respondent recognizes that the mature-child exception requires more than a generalized wish to live with one parent.

*Haimdas* distinguishes a preference to remain in the United States from a particularized objection to repatriation. 720 F. Supp. 2d at 206. The proper inquiry is therefore not simply:

Does C.P.S. prefer living with his father? Rather, the Court should determine: Does C.P.S. object to being returned to Korea, and if so, why?

The Court should consider whether the child's reasons are particularized, rational, independently held, consistent over time, and grounded in his own experiences.

The Court should also examine whether the objection reflects undue influence or coaching. That concern is appropriately tested through the Court's direct interview and through testimony from persons who have observed C.P.S. in different settings.

In *Swett*, the district court expressly examined possible parental influence and nevertheless found that, on balance, the child's objections were thoughtful, reflective, genuine, coherent, and durable.

The same fact-specific inquiry should occur here.

## POINT V
## THE NEW YORK JUDGMENT OF DIVORCE AND THE SUBSEQUENT KOREAN PROCEEDINGS ARE RELEVANT TO RESPONDENT'S KNOWLEDGE AND CONDUCT

Respondent commenced the New York divorce action in 2018. The Petitioner was personally served in Korea and did not appear. The New York Judgment of Divorce was entered November 16, 2020.

Respondent understood that Judgment to govern the parties' marital status.

More than one year later, Petitioner commenced separate proceedings in Korea.

Respondent's position is that he did not receive notice of the Korean action, did not participate in it, did not know that a separate Korean divorce judgment had been entered, and did not knowingly disregard that judgment.

Respondent is presently challenging the Korean judgment on appeal. The Court need not determine the merits of that appeal. Nor does Respondent argue that his subjective lack of knowledge alone determines what custody rights existed under Korean law for purposes of Article 3.

The point is narrower. To the extent Petitioner contends that Respondent knowingly ignored an existing Korean judgment or deliberately refused to participate in those proceedings, Respondent is entitled to present evidence explaining what he actually knew and why he was operating under the New York Judgment.

The legal effect of the Korean judgment and Respondent's knowledge of its existence are distinct issues.

## POINT VI
## RESPONDENT'S SCHOOL, COUNSELING, MEDICAL, AND OTHER THIRD-PARTY EVIDENCE SHOULD BE CONSIDERED ONLY TO THE EXTENT IT BEARS UPON A PROPER HAGUE ISSUE

Respondent does not ask the Court to determine that New York provides C.P.S. with a better school, better medical care, better activities, or a preferable lifestyle. Such a comparative best-interests inquiry is not the purpose of the Hague Convention. Rather, Respondent offers third-party evidence only to the extent it bears upon a Convention issue properly before the Court.

Respondent intends to present testimony from individuals who possess firsthand knowledge of C.P.S. These witnesses will not determine whether C.P.S. satisfies Article 13. That determination belongs solely to the Court. Their observations are nevertheless relevant to the factual inquiry.

Mara Sophia Skinner has substantial firsthand interaction with C.P.S. and will testify concerning his demeanor, communications, independence, and whether she personally observed coaching, pressure, or coercion.

Tina Mahoney will testify concerning matters personally observed during her interactions with C.P.S., including his demeanor, emotional presentation, communications, behavior, and the circumstances under which he expressed his views. Respondent does not offer her to render psychiatric diagnoses, forensic psychological opinions, or custody recommendations.

Floretta Prestigiacomo coached C.P.S. in soccer and basketball over two separate sports seasons and can provide an independent, non-family account of his communication, ability to follow instruction, decision-making, interaction with adults and peers, and general maturity in a structured setting.

This type of corroborating evidence is consistent with the analysis employed in *Swett*. There, the district court considered testimony from teachers and a school counselor, among others, in evaluating the child's maturity. The court noted that such witnesses described the child's articulateness, responsibility, judgment, social maturity, and ability to navigate difficult situations.

For purposes of the mature-child defense, relevant evidence may include objective information bearing upon the child's maturity, communication, functioning, reasoning, independence, and the factual circumstances underlying reasons the child himself expresses.

Again, *Swett* is instructive. In assessing the mature-child defense, the district court considered evidence concerning the child's academic motivation, articulateness, social judgment, responsibility, educational goals, and observations of teachers and counselors.

Respondent does not contend that school or medical records independently establish the Article 13 defense.

Their relevance depends upon the particular purpose for which they are offered and the evidence elicited at trial.

**POINT VII**
**ARTICLE 12'S "NOW SETTLED" EXCEPTION IS DISTINCT FROM RESPONDENT'S ARTICLE 13 DEFENSES**

Respondent recognizes that Article 12's "now settled" exception applies only where the Hague proceeding was commenced more than one year after the legally operative wrongful removal or retention. The passage of time during the pendency of the federal proceeding does not independently create an Article 12 defense.

*Swett Urquieta* confirms that the pertinent date is the wrongful-retention date and further explains that an extension of authorization can postpone that date. *Swett Urquieta v Bowe*, 120 F.4th at 338–40(2d Cir. 2024).

Respondent therefore does not ask the Court to treat C.P.S.'s present length of residence in New York, standing alone, as creating an Article 12 defense. But Article 12 does not eliminate Respondent's separate Article 13 defenses.

Whether Petitioner consented or acquiesced under Article 13(a), and whether C.P.S. objects to return and possesses sufficient maturity under Article 13, remain independent questions.

## POINT VIII
## IF RESPONDENT ESTABLISHES THE MATURE-CHILD EXCEPTION, THE COURT SHOULD EXERCISE ITS DISCRETION TO DECLINE RETURN

Establishing an Article 13 exception permits the Court to refuse return; it does not compel refusal in every case.

In *Swett*, the district court found that the eleven-year-old child possessed sufficient maturity, genuinely objected to return, and had articulated durable and coherent reasons for that objection. The court ultimately declined repatriation, and the Second Circuit affirmed substantially for the reasons stated by the district court.

The Court should follow the same disciplined approach here.

It should interview C.P.S. directly, assess his maturity and independence, examine the reasons underlying his objection, consider whether his views have remained consistent over time, evaluate any evidence of undue influence, and consider the corroborating firsthand observations of other witnesses.

If the Court finds by a preponderance of the evidence that C.P.S. genuinely objects to returning to Korea and possesses the age and degree of maturity contemplated by Article 13, Respondent respectfully submits that the Court should exercise its discretion and decline return.

## CONCLUSION

C.P.S. came to the United States with Petitioner's consent. His initial departure from Korea was therefore lawful.

The Court must determine whether and when that authorized stay subsequently became a wrongful retention and evaluate the parties' actual communications and conduct.

If Petitioner establishes wrongful retention, the Court must separately consider Respondent's affirmative defenses.

Article 13(a) requires consideration of the nature and scope of Petitioner's consent and her subsequent conduct.

Article 13's mature-child provision requires the Court to determine whether C.P.S. genuinely objects to returning to Korea and whether he possesses sufficient maturity for his views to be considered.

C.P.S.'s objection was not created for this trial. It has been expressed over time and in multiple settings. Respondent respectfully requests that the Court interview C.P.S. directly and evaluate his views together with the firsthand testimony of witnesses who have observed his demeanor, communication, independence, judgment, and consistency.

Finally, Respondent understood the parties to be operating under the November 16, 2020 New York Judgment of Divorce and maintains that he did not know Petitioner subsequently obtained a Korean divorce judgment. Respondent does not ask this Court to adjudicate his Korean appeal; he asks only that the Court evaluate his conduct based upon what he actually knew.

For the foregoing reasons, Respondent Michael Skinner respectfully requests that the Court deny the Petition seeking the return of C.P.S. to the Republic of Korea, together with such other and further relief as the Court deems just and proper.

Dated: August 12, 2026

Respectfully submitted,

Todd D. Bennett, Esq.
Attorney for Respondent
123 Court Street
Herkimer, NY 13350
P: 315-866-6648
F: 315-866-1079
Bar Roll:505405